**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SOSA,<br>        *Plaintiff*,<br><br>        v.<br><br>RICHESON, et al.<br>        *Defendants.* | No. 3:21-cv-927 (VLB) |

## INITIAL REVIEW ORDER

Plaintiff Andrés Sosa, a sentenced *pro se* inmate at Cheshire Correctional Institution ("Cheshire") in the custody of the Department of Correction ("DOC"), filed this civil rights complaint[1] under 42 U.S.C. § 1983. [ECF No. 1 (Compl.)].[2] The Court dismissed his original complaint for failure to provide "a short and plain statement" of his claim in compliance with Federal Rule of Civil Procedure Rule 8(a). [ECF No. 10 (IRO)].

Plaintiff has filed an amended complaint against Dr. Robert Richeson, Dr. Kathleen Maurer; Regional Chief Operating Officer ("RCOO") Kristen Shea; Nurse Jacob Degennaro, RN; Nurse Jane Ventrella, RN; Nurse Amy Lenarz, LPN; Nurse Vincent Santavenere, APRN; Nurse Sandra Charles, APRN; Nurse Deborah Broadley, APRN; Dr. Ricardo Ruiz; Administrative Remedy Coordinator ("AMC")

---

[1] Plaintiff is proceeding *in forma pauperis.* [ECF No. 7 (Order)].

[2] The Court may "take judicial notice of relevant matters of public record." *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The DOC website shows that Plaintiff was sentenced to forty-three years of incarceration on May 31, 2001. http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=260589.

Nurse Debbie Wilson Cruz, RN; Correction Officer Lambo, Correction Officer Colon Jr., Correction Officer Whittend, Lieutenant Castro, Lieutenant Washington, Correction Officer Marquis, Connecticut DOC, UConn Health Center ("UConn Health"),[3] UConn President Thomas Katsouleas, Dr. Andrew Agwunobi, UConn Health President of Medical Association Jennifer Jackson, and Warden Denise Walker.  [ECF No. 12 (Am. Compl.) at 2-5].  His allegations all concern events that occurred during his incarceration at Cheshire.  *Id.* at ¶ 6.  He alleges violation of his Eighth and Fourteenth Amendment rights and seeks damages, a declaratory judgment, and injunctive relief.  *Id.* at 22.

For the following reasons, the Court will permit Plaintiff to proceed on some of his Eighth Amendment claims.

I.      FACTS

On December 29, 2018, Plaintiff was sent to the Emergency Room by ambulance because his heart stopped for three seconds.  Am. Compl. at ¶ 57.  Earlier that year, the State of Connecticut terminated its contract with UConn Health due to concerns about the medical treatment for inmates within the DOC.  *Id.* at ¶ 80.

---

[3] **Federal Rule of Civil Procedure 10 requires that all defendants be listed in the case caption.  UConn Health Center is not named in the case caption.   However, Plaintiff has alleged UConn Health as party against whom he brings claims in the body of complaint.  *See* Am. Compl. at 5 (¶ 29).  Thus, the Court will consider whether Plaintiff has brought any plausible claims against UConn Health because "courts have found *pro se* complaints to sufficiently plead claims against defendants not named in the caption when there are adequate factual allegations to establish that the plaintiff intended them as defendants."  *Imperato v. Otsego Cty. Sheriff's Dep't*, No. 313CV1594 (BKS/DEP), 2016 WL 1466545, at \*26 (N.D.N.Y. Apr. 14, 2016) (citing cases).**

On August 17, 18, and 19, 2019, Lieutenant Washington toured Plaintiff's housing unit. *Id.* at ¶ 33. Plaintiff informed him that he was having rapid heart palpitation and that both of his legs were swollen. *Id.* Correction Officer Washington told Plaintiff that he would notify medical staff member, Nurse Ventrella. *Id.*

On these same days, Plaintiff also informed Correction Officer Lambo about his palpitations and his swollen legs. *Id.* at ¶ 33. Correction Officer Lambo said he would call medical staff. *Id.* Medical staff did not respond to Plaintiff's complaint. *Id.* at ¶¶ 33-34.

On August 20, during the first and second shifts, Plaintiff notified Correctional Officers Colon, Whittend, and Marquis, and Lieutenant Castro about his rapid/irregular heartbeat and his legs that were so swollen he could not see his ankles. *Id.* at ¶¶ 35-38. They each promised to contact the medical unit for Plaintiff, but no medical staff ever came to assist Plaintiff. *Id.* When Plaintiff informed Lieutenant Castro later that day that no medical staff came assisted him, Castro assured Plaintiff he notified Nurse Ventrella about Plaintiff's medical issue; nevertheless, medical staff did not treat Plaintiff. *Id.* at ¶ 38.

On that same date, Nurse Lenarz arrived at the RHU to deliver Plaintiff's nightly medication. *Id.* at ¶ 39. After Plaintiff informed her of his heart palpitations and showed her his swollen legs, she ignored his request for medical assistance and informed him that she was a Licensed Practical Nurse and that it was Nurse Ventrella's responsibility to provide him with medical attention. *Id.* at ¶ 39.

On August 21, 2019, Plaintiff wrote to Deputy Warden Peterson informing her of his heart failure symptoms, swollen legs, and lack of medical treatment.  *Id.* at ¶ 41.  She forwarded his request to RCOO Shea.  *Id.*  The Amended Complaint does not allege when RCOO Shea received the forwarded message.

Sometime in August 2019, Plaintiff wrote to RCOO Kirsten Shea to inform her of his heart palpitations, swollen legs, heart failure symptoms and lack of medical treatment by her employees.  *Id.* at ¶ 40.  The Amended Complaint alleges she never replied to his complaint or provided him with timely medical attention.  *Id.*  However, Plaintiff attached a letter from RCOO Shea to the Amended Complaint indicating that, on September 3, 2019, RCOO Shea instructed a nurse to call Plaintiff "today" to assess his heart rate.

The same day RCOO Shea dated that letter, Dr. Ruiz performed an EKG which he interpreted to be normal.  *Id.* ¶¶ 41-42.  *Id.* at ¶ 42.  No further medical tests were taken for Plaintiff's swollen legs or difficulty urinating.  *Id.*

On November 6, Plaintiff was seen by a cardiologist at UConn Health.  *Id.* at ¶ 58.  On December 11, UConn Health staff conducted a stress test and ordered a Holter monitor for Plaintiff to wear.  *Id.*  The cardiologist noted that DOC should make an outpatient follow-up appointment for Plaintiff with the cardiologist.  *Id.* at ¶ 59.  The stress test did not reveal an abnormality. *Id.* at ¶ 59.  Plaintiff continued to have heart palpitations.  *Id.* at ¶ 58.

Nurse Ventrella failed to take his vital signs pursuant to protocol or to educate him about the use of the Holter monitor when Plaintiff returned to Cheshire.  *Id.* at ¶ 63.  She stated that Plaintiff was fine and sent him to his cell.  *Id.*

Plaintiff received the Holter monitor for a 24-hour study on December 11, but Nurse Degennaro failed to call him to have him take the Holter monitor off by December 14. *Id.* at ¶ 62. Plaintiff notified a nurse that he had the monitor on for three days but had not been permitted to shower. *Id.* At the medical unit, Nurse Degennaro asked him if he hit the button to record the data. *Id.* Plaintiff responded that no one told him to do so. *Id.*

On December 20, Plaintiff saw a cardiologist who could not review his diagnosis from the 24-hour Holter monitor study, because Nurse Degennaro failed to send the Holter monitor results to UConn Health. *Id.* at ¶ 61. It appears from the Amended Complaint that the Holter monitor was ultimately activated and data was recorded on December 23, 2019. *Id.* at ¶ 60.

On December 21, 2019, Plaintiff filed a grievance against Nurse Degennaro complaining that he left the heart Holter monitor on Plaintiff, failed to educate Plaintiff about its use, and failed to send the monitor back to UConn Health for results prior to Plaintiff seeing a cardiologist. *Id.* at ¶ 51. ARC Nurse Wilson Cruz forwarded this grievance to her supervisor, but it was never processed. *Id.*

At some point, a cardiologist reviewed Plaintiff's 24-hour Holter monitor study dated December 23, 2019 and noted a "predominant rhythm is sinus," "[r]are supraventricular ectopy recorded" and "one episode of strong heart be[at]s showing a supraventricular couplet." *Id.* at ¶ 60.

On December 24, Dr. Ruiz informed him that his premature ventricular contractions were normal requiring no treatment or medication. *Id.* at ¶ 77.

On January 9, 2020, Plaintiff went to the medical unit because of his swollen legs and was seen by Nurse Davidson. *Id.* at ¶ 43. She documented Plaintiff's complaint of edema, directed him to keep his feet elevated while resting, and documented the absence of edema at the time of the examination. *Id.*

On January 31, Plaintiff went to the medical unit with chest discomfort and was seen by Nurse Pereda, who performed an EKG that showed results similar to the results of his previous EKG. *Id.* at ¶ 44. She instructed him to practice breathing exercises to control anxiety as she had assessed anxiety was causing him the chest discomfort. *Id.* at ¶ 44.

On February 11, Dr. Ruiz saw Plaintiff for what he assessed to be an "atypical chest pain" that Plaintiff described as a sharp sensation whenever he took a deep breath. *Id.* at ¶¶ 45, 78. Plaintiff also reported coughing during several periods that was mostly dry but occasionally produced a thick sputum. *Id.* He informed Plaintiff that his EKG/EST and Holter monitor tests conducted at UConn Health showed normal results. *Id.* at ¶ 45. Plaintiff notes that UConn Health cardiology did not diagnose his heart problem and that Dr. Ruiz documented his chest pain as "SUSPECT to secondary to COUGH." *Id.* at ¶¶ 45, 78.

On February 19, Dr. Ruiz ordered a two-view chest x-ray and ruled out certain heart and lung conditions but refused to refer Plaintiff to an outside provider for a second opinion. *Id.* at ¶¶ 46, 78.

On February 26, Plaintiff saw a cardiologist at UConn Health who checked him, prescribed medication, and ordered a follow-up appointment 12 weeks later,

on or about May 20, 2020. *Id.* at ¶ 64. Plaintiff did not see the cardiologist until July 10, 2020, approximately 20 weeks later. *Id.*

On July 10, Plaintiff was seen again by a cardiologist at UConn Health, without any new documentation that was different from his previous appointment. *Id.* at ¶ 65. A cardiology follow-up appointment was scheduled for six months later on January 26, 2021. *Id.* at 68. Plaintiff did not actually attend this follow-up appointment until March 17, 2021. *Id.*

On September 9, Plaintiff returned to see the cardiologist to determine whether his heart was strong enough for oral surgery. *Id.* at ¶ 67. At that time, his medication dosage was increased. *Id.*

On March 15, 2021, Plaintiff was diagnosed with osteoma of paranasal sinus.[4] *Id.* at ¶ 55. Plaintiff has experienced pain and dizziness, vomiting, nausea, unsteadiness, lack of balance and pressure on his vision. *Id.*

Two days later, Plaintiff was seen by cardiologist who conducted an EKG, and noted that Plaintiff was diagnosed with hypertension, experienced extra heartbeats, and did not complain of dizziness.[5] *Id.* at ¶¶ 49, 68. The cardiologist documented that Plaintiff's dizzy spell complaints sounded like vertigo and ordered an MRI and follow-up appointment in three months. *Id.* at ¶ 49. Plaintiff

---

[4] According to this Court's research, osteomas are benign tumors that can occur, *inter alia,* in the sinus areas. *See What is an osteoma?* MED. NEWS TODAY (Jul. 20, 2022), *https://www.medicalnewstoday.com/articles/osteoma#symptoms;* Viswanatha, B., *Maxillary sinus osteoma: two cases and review of the literature*, 32(3) ACTA OTORHINOLARYNGOL ITAL. 202, 202-05 (Jun. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3385060/.

[5] Plaintiff appears to contest this finding because he maintains that he was at the appointment due to his dizziness. *Id.* at ¶ 49.

did not receive the MRI or follow up appointment. *Id.* Although the cardiologist ordered another 24-hour Holter monitor, the UConn Health nurse never provided him with the monitor before he returned to the prison. *Id.* at ¶ 68. She guessed that it would be provided by the prison. *Id.*

On March 24, Plaintiff was sent to UConn Health for an appointment with its Otolaryngology Department. *Id.* at ¶ 47. Officers Stellmach and Jones accompanied Plaintiff to UConn Health and were told by UConn Health staff that Plaintiff was not scheduled for an appointment. *Id.* Officer Jones called Nurse Degennaro who provided him with the correct location. *Id.* However, once Plaintiff was brought to this location, he was informed by a Jane Doe that he did not have a scheduled appointment. *Id.* Later, Nurse Degennaro informed Officer Jones Plaintiff needed to be seen. *Id.* After waiting for more than an hour, Plaintiff was seen by Joanna Petlik (a resident) and Dr. Falcone (an otolaryngologist) for his right frontal osteoma, dizziness, loss of balance, and right eye pressure. *Id.* Their findings were all normal, but they documented that Nurse Degennaro had not sent an x-ray of his sinuses. *Id.* Dr. Falcone ordered a CT Scan/MRI, an appointment with a neurologist, and a follow-up in four weeks. *Id.* at ¶¶ 73, 75.

Upon Plaintiff's return to Cheshire, Nurse Degennaro failed to follow protocol when he did not take Plaintiff's vital signs in the Admitting and Processing room. *Id.* at ¶ 48. He also opened a sealed envelope containing Plaintiff's medical information and discussed its contents in front of other inmates in violation of Plaintiff's rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *Id.*

On March 30, Plaintiff saw Dr. Ruiz for heart palpitations and notified Dr. Ruiz that he never received the Holter monitor ordered by the cardiologist on March 18, 2021.  *Id.* at ¶ 78.  Dr. Ruiz told Plaintiff he would follow up about the monitor.  *Id.*

On April 23, Nurse Degennaro called him to the medical unit to install the Holter monitor even though he is not a cardiac tech.  *Id.* at ¶ 69.   Later, Plaintiff asked a correction officer to call the medical unit because the Holter monitor was not working.  *Id.* at ¶ 70.  Plaintiff was seen by Nurse Ventrella who could not figure out the problem with the monitor but refused to call the company's telephone number.  *Id.*  She indicated that she would call Nurse Degennaro about the problem. *Id.*  Plaintiff had to wait five days for Nurse Degennaro to contact him about the problem.  *Id.*  As a result, Plaintiff lost five to six days for recording data.  *Id.*

On May 6, Plaintiff returned to the medical unit to tell Nurse Degennaro the Holter monitor was not working.  *Id.* at ¶ 71.  He asked Nurse Broadley whether he could take Plaintiff off the monitor as it was not working.  *Id.*  She agreed to the removal.  *Id.*  Plaintiff had to wait until May 10, 2021 for Nurse Degennaro to send the monitor and its accompanying data to the cardiologist to read the data.  *Id.*

On May 14, Nurse Degennaro mailed him his forms for the MRI, CT scan, and caridiologist appointments.  *Id.* at ¶ 76.  Plaintiff returned them to Nurse Degennaro, who then took five days to process the forms.  *Id.*

On May 18, ARC Nurse Wilson Cruz informed Plaintiff that the Utilization Review Committee no longer existed, and that UConn Health should be blamed for the delay in medical appointments and follow-ups.  *Id.*  Defendants Cruz, Charles, Broadley, Ruiz, Degennaro, Santavenere, Richeson, Maurer, and Shea all blame

UConn Health, Katsouleas, Agwunobi, and Jackson for any delay in providing Plaintiff with outside medical treatment and medical devices.  *Id.* at ¶ 52.

On June 16, Plaintiff received the MRI ordered by the cardiologist three months prior, on March 17.  *Id.* at ¶ 72.

On June 22, Plaintiff had the CT scan ordered by Dr. Falcone on March 24, 2021.  *Id.* at ¶ 73.  He saw the neurologist on September 10, 2021 and received the MRI on October 21, which Dr. Falcone also ordered.  *Id.*  Plaintiff received his follow-up appointment at UConn Health with Dr. Falcone on October 27, 2021.  *Id.* at ¶ 75.

Plaintiff provided Warden Walker with notice about his medical needs and the deficiencies of her subordinates in providing him with medical care.  *Id.* at ¶ 53.

Defendants deny and delay his access to medical care by failing to bring him to scheduled appointments and by failing to provide him with prescribed treatments ordered by the outside doctors.  *Id.* at ¶ 54.  Plaintiff continues to feel dizzy, pressure in his vision, and as if something "moved in front of his forehead," and he experiences constant rectal bleeding.  *Id.* at ¶ 50.

The medical unit continues to tell him to wait.  *Id.*  UConn Health will not diagnose his conditions and he is frightened not knowing whether he has cancer.  *Id.* at ¶¶ 55-56.  The Defendants have ignored the classic heart attack symptoms, mental torture, dissemination of false information, conspiracy, and fraudulent record keeping.  *Id.* at ¶ 79.  Plaintiff fears for his life and well-being as a result of receiving UConn Health care, because he is unsure of its quality; he is subjected to having students (residents) test their skills on him without his consent; and his appointments and/or follow-ups are not scheduled on time.  *Id.* at ¶ 81.

## II.     STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'") (quoting 28 U.S.C. § 1915A).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted)).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 555, 570.  A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101-02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

"Rule 21 provides that a court 'may sever any claim against a party.' Fed. R. Civ. P. 21. The decision whether to sever a claim is committed to the sound discretion of the trial court." *Costello v. Home Depot U.S.A., Inc*., 888 F. Supp. 2d 258, 263 (D. Conn. 2012) (internal quotation marks omitted). "Courts consider whether: (1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided;

and (5) different witnesses and documentary proof are required for the separate claims." *Id.*

III.   **DISCUSSION**

In Counts One through Six, Plaintiff asserts claims against Defendants for violation of his Eighth Amendment rights due to inadequate or delayed treatment. *See* Am. Compl. at 18-21.   In Count Seven, he asserts claims of Eighth and Fourteenth Amendment violations in connection with ARC Nurse Wilson Cruz's handling of his administrative remedies.  *Id.* at 21.

As an initial matter, Plaintiff's § 1983 claims against the DOC or UConn Health are not actionable, because neither a state nor a state agency is a "person" subject to suit under 42 U.S.C. § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (state and state agencies not persons within meaning of Section 1983); *Blaine v. UConn Health Care*, No. 3:18-CV-359 (MPS), 2018 WL 1368909, at *2 (D. Conn. Mar. 16, 2018)   (dismissing claim against CMHC because it is a division of a state agency and not "person" subject to suit).  The Court therefore DISMISSES claims against these Defendants.

Accordingly, the Court will next consider whether Plaintiff has stated any plausible claims against the individual defendants for damages. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted). In *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020), the Second Circuit clarified the pleading standard applicable to supervisory defendants in cases

concerning alleged violations of constitutional rights.   The Second Circuit explained: "[A]fter *Iqbal*, there is no special rule for supervisory liability.   Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' …. The violation must be established against the supervisory official <u>directly</u>."   *Id.* at 618 (emphasis added) (quoting *Ashcroft*, 556 U.S. at 676).

A.      <u>Counts One Through Six: Eighth Amendment Violations</u>

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment of sentenced prisoners. *See* U.S. Const. amend. VIII.  The U.S. Supreme Court held in *Estelle v. Gamble*, 429 U.S. 97 (1976), that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain … proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted).   The Supreme Court explained that "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of "deliberate indifference to [a prisoner's] serious medical needs." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).  To prevail on such a claim, a plaintiff must prove that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will

result.'"  *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)).  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm."  *Hill*, 657 F.3d at 123.

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Id.* at 122.  This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280.  Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay."  *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (citing *Salahuddin*, 467 F.3d at 280) (other citations omitted) (summary order).  The court's objective "serious medical need inquiry can take into account the severity of the temporary deprivation alleged by the prisoner."  *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).  The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of

care, rather than the severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.*; *see also Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]") (internal citation omitted).

Relevant to the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin,* 467 F.3d at 280; *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate a prisoner's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

1. *Count One and Two: Deliberate Indifference for Lack of Medical Treatment While in the RHU*

Plaintiff alleges violation of his Eighth Amendment rights arising from denial of medical treatment for his heart palpitations, swollen legs, difficulty urinating, and signs of heart failure while he was confined for forty days in the RHU. Compl. at ¶¶ 82-86. He asserts these claims against Correctional Officers Lambo, Colon,

Whittend, and Marquis; Lieutenants Castro and Washington; Nurses Ventrella and Lenarz; and RCOO Shea.

For purposes of initial review only, the Court assumes that Plaintiff had a serious need for medical attention concerning his heart condition and swollen legs while he was confined in the RHU.

Crediting Plaintiff's allegations as true, the Court concludes that Plaintiff has sufficiently raised an inference that Defendants Lambo, Colon, Whittend, Marquis, Castro and Washington were aware of Plaintiff's serious medical needs but acted with deliberate indifference by failing to take steps to provide him with medical treatment. *See* Compl. at ¶¶ 32-38. Plaintiff's allegations also indicate Nurses Ventrella and Lenarz were aware of his serious medical needs but also failed to take steps to provide him attention for his serious medical needs. *Id.* at ¶¶ 38-39.

Accordingly, the Court will permit Plaintiff to proceed on his Eighth Amendment claims against Correctional Officers Lambo, Colon, Whittend, and Marquis, Lieutenants Castro and Washington, and Nurses Ventrella and Lenarz.

Plaintiff has not, however, alleged a plausible Eighth Amendment claim against RCOO Shea, who allegedly failed to respond to his written complaint about his lack of medical attention from DOC staff or to the grievance about Nurse Degennaro forwarded by ARC Nurse Wilson Cruz. The Amended Complaint does not allege when RCOO Shea received Plaintiff's written complaint. Nor does it allege that she chose to ignore his letter, investigated the events and then denied his complaint, or otherwise acted in a manner violating his constitutional rights. As a general matter, merely alleging that a defendant <u>received</u> an inmate's letter or

complaint is insufficient to establish the official's personal involvement, let alone failing to allege that Defendant even received the letter or complaint at all. *See, e.g., Evans v. Barone*, 3:22CV00074(SALM), 2022 WL 408920, at *6 (D. Conn. Feb. 10, 2022) (finding no personal involvement when the plaintiff "alleges only that [defendant] failed to take any action based on a letter or letters he wrote to them; he does not even allege that they received the letters"); *Delaney v. Perez*, No. 19-CV-6084 (NSR), 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (citing cases where mere receipt of complaint, without action, failed to establish personal involvement).

But here, evidence attached to the Amended Complaint shows that RCOO Shea took affirmative steps to expedite Plaintiff's medical treatment. Specifically, RCOO Shea responded directly to Plaintiff on September 3, 2019, indicating he would receive treatment that day—and indeed he did. *See* Am. Compl. at 41. Accordingly, the Court must DISMISS the Eighth Amendment claim against RCOO Shea because Plaintiff has not plausibly alleged she was deliberately indifferent to his medical needs.

### 2. *Count Three: Nurse Degennaro's Deliberate Indifference for Failing to Ensure Timely Medical Care*

Plaintiff asserts that Nurse Degennaro acted with deliberate indifference to his medical needs by failing to ensure that he was provided with timely medical treatment as ordered by Plaintiff's physicians. Compl. at ¶ 89. Specifically, Plaintiff alleges that Nurse Degennaro violated his Eighth Amendment rights by (a) failing to educate him about how to use the Holter monitor on December 11 so it could not be removed as scheduled on 14, 2019; (b) failing to send the Holter monitor results to UConn Health prior to his December 20, 2019 visit; (c) incorrectly scheduling an

appointment for Plaintiff with the UConn Health Otolaryngolgy Department on March 24, 2021, resulting in a more-than-one-hour delay;  (d) failing to send x-rays for physician review prior to an appointment on March 24, 2021; (e) failing to take his vital signs in accordance with protocol on March 24, 2021; (f) discussing the contents of Plaintiff's health records in front of other inmates on March 24, 2021; (g) incorrectly installing his Holter monitor when he was not a cardiac tech on April 23, 2021; (h) failing to provide timely repair for Plaintiff's Holter monitor from April 23 through 28; and (i) delaying the process to send the Holter monitor and corresponding data to providers from May 6 to May 10, 2021; and (j) failing to timely process his forms for the MRI, CT scan, and cardiologist appointments on May 14, 2021.  *Id.* at ¶¶  47, 48, 62, 70, 71, 76.

To the extent Plaintiff asserts his Eighth Amendment claims against Nurse Degennaro based on delaying his medical treatment, Plaintiff has not sufficiently alleged the objective component of the Eighth Amendment analysis.  "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness."  See *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012).  Plaintiff's allegations do not indicate that Nurse Degennaro's conduct caused a delay that exacerbated his medical conditions.  Nor has he alleged that Nurse Degennaro caused a needlessly prolonged period of of delay; rather, the delays lasted mere days for non-emergent situations.  For example, Plaintiff complained that Nurse

Degennaro caused a delay of <u>five days</u> to repair his Holter monitor, <u>four days</u> for him to send the monitor and journal to the cardiologist, and <u>five days</u> to process his forms.  *Id.* at ¶¶ 70, 71, 76.  He has not stated that his diagnosis was delayed or his condition worsened as a result of Degennaro's failure to send his medical records.  *See id.* at ¶¶ 47, 61.

Plaintiff's allegations concerning Nurse Degennaro's state of mind are similarly deficient.  For nearly all factual allegations, Plaintiff did not allege facts reflecting that Nurse Degennaro acted with a state of mind greater than negligence in connection with his failure to send medical records, failure to take his vital signs, discussion of his medical records in front of other inmates, installation of the Holter monitor, failure to properly instruct Plaintiff about the monitor, failure to provide timely repair of the Holter monitor, and any delayed scheduling of Plaintiff's appointments.  Plaintiff has not plausibly alleged facts suggesting that Nurse Degennaro was conscious this conduct posed a substantial risk of causing Plaintiff serious medical harm.  *See Salahuddin*, 467 F.3d at 281.

Suppose Plaintiff is asserting a claim based on violation of HIPAA, HIPAA does not confer a private right of action on an individual.  *See Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 317 n.42 (W.D.N.Y. 2018) ("Only the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action. There is no private right to sue for a HIPAA violation.") (citations omitted); *Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) (collecting cases across numerous circuits holding that no private right of action exists under HIPAA); *Rzayeva v. United*

*States*, 492 F. Supp. 2d 60, 83 (D. Conn. 2007) (dismissing HIPAA claim because "HIPAA, which regulates the privacy of medical records, provides no private right of action, and enforcement of HIPAA is reserved exclusively to the Secretary of Health and Human Services.") (citations omitted); *Barnes v. Glennon*, No. 9:05-CV-0153 (LEK/RFT), 2006 WL 2811821, at *5 (N.D.N.Y. Sept. 28, 2006) (HIPAA "does not confer a private cause of action ... [or] either explicitly or implicitly, confer to private individuals a right of enforcement") (citations omitted).  Plaintiff's alleged facts fail to raise an inference that Nurse Degennaro's failure to follow protocol rose to the level of an Eighth Amendment violation.

Even if Plaintiff did have a cause of action for the disclosure of his medical information in a public setting, this claim would be severed.  It is an independent, seperate and distinct occurance from those which form the basis of the deliberate indifference claims predominating the complaint.  *See Costello*, 888 F. Supp. 2d at 263.

The Court notes Plaintiff pleaded Nurse Degennaro deliberately delayed processing the forms for his May 2021 cardiology appointment with a willful and malicious state of mind.  *See id.* at ¶ 76.  While Plaintiff uses these legal terms, the allegations fail the objective component of the test because the allegation is a mere conclusion of law devoid of any factual support.  Thus, the the claims against Nurse Degennaro are not plausible and are DISMISSED.

       **3.**     *Count Four: Deliberate Indifference Based on Policies*

Plaintiff alleges Eighth Amendment violation on the basis of policies restricting expensive follow-up care against Dr. Ruiz, Nurse Broadley, Nurse

Charles, Nurse Santavenere, RCOO Shea, Nurse Degennaro, Dr. Richeson, Dr. Maurer, ARC Nurse Wilson Cruz, Warden Walker, UConn President Katsouleas, Dr. Agwunobi and UConn Health President of Medical Association Jackson.  Am. Compl. at ¶¶ 92, 97.  Plaintiff alleges that Defendants have policies "restricting, if not outright denying, follow-up care ordered by doctor[]s when such care is expensive." *Id.*

After *Tangreti*, Plaintiff must allege facts showing that a defendant or defendants personally "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  983 at 618-19.  Plaintiff has not alleged facts indicating that any Defendant created, or allowed the continuance of a policy, while conscious that such policy posed a substantial risk of serious harm to Plaintiff.  A plaintiff cannot rely on conclusory allegations about what a defendant "should know" to establish a defendant's personal involvement.  *Monroe v. Cty. of Rockland*, No. 21 CV 5244 (VB), 2021 WL 4084149, at *1 (S.D.N.Y. Sept. 8, 2021). Accordingly, Plaintiff has not alleged a plausible Eighth Amendment violation based on the asserted policy to restrict expensive inmate follow-up health care. This Count is DISMISSED.

        4.    ***Count Five: Nurse Ventrella's Deliberate Indifference for Failure to Ensure Plaintiff's Medical Care***

Plaintiff alleges that Nurse Ventrella failed to take steps to ensure his health care or by delaying his medical treatment.  Compl. at ¶ 94.  Plaintiff alleges that Nurse Ventrella failed to take his vital signs pursuant to protocol after he returned

from seeing a cardiologist, failed to educate him about the use of the Holter monitor, and failed to ensure that the Holter monitor was in working order. *Id.* at ¶¶ 63, 70. However, Plaintiff's factual allegations fail to suggest that Nurse Ventrella's conduct caused any serious medical consequence due to a delay in the Holter monitor study.

Further, Plaintiff's factual allegations provide no inference that Nurse Ventrella acted with a state of mind more than negligence. *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (explaining that a sentenced prisoner must prove "that the charged official possessed a state of mind that is the equivalent of criminal recklessness") (internal quotation marks omitted). Plaintiff's facts do not indicate that Nurse Ventrella was aware that her conduct posed a substantial risk of serious medical harm to Plaintiff when she failed to follow protocol, educate Plaintiff about the Holter monitor, and recognize that the monitor was not working. Accordingly, the Court must DISMISS these claims against Nurse Ventrella as not plausible.

5.   *Count Six: Deliberate Indifference for Subjecting Plaintiff to Health Care at UConn Health*

Plaintiff also asserts that Defendants Richeson, Mauer, Shea, Ruiz, Charles, Broadley, Santavenere and Degennaro violated his Eighth Amendment rights by subjecting him to health care at UConn Health. Am. Compl. at ¶ 96. Plaintiff alleges that Defendants failed to take steps to bring him to another hospital despite their knowledge that state officials had terminated the contract with UConn Health due to inadequate medical treatment for inmates. *Id.*

Allegations about a defendant's general knowledge are insufficient to demonstrate personal involvement under § 1983. *See Kravitz v. Leis*, No. 17-cv-600, 2019 WL 1332774, at *8 (N.D.N.Y. Feb. 11, 2019) (finding defendant's "general knowledge" of plaintiff's religious affiliation "insufficient to demonstrate personal involvement," because "plaintiff must show "some tangible connection between the unlawful conduct and the defendant"). Here, Plaintiff has not alleged facts suggesting that any Defendant was aware that Plaintiff would receive inadequate medical care for his medical conditions as a result of being taken to UConn Health. The Court will DISMISS this claim as not plausible.

**B.** **Count Seven: Eighth Amendment and Fourteenth Amendment Violations**

Plaintiff alleges that ARC Nurse Wilson Cruz violated his rights under the Fourteenth Amendment Due Process Clause and the Eighth Amendment based on her failure to process his administrative remedies forms. Am. Compl. at ¶¶ 100-101. Plaintiff complains that ARC Nurse Wilson Cruz forwarded his grievance filed against Degennaro to her supervisor but failed to process properly so his access to health care was delayed or denied. *Id.* at ¶ 51.

Plaintiff has not alleged facts to suggest that ARC Nurse Wilson Cruz was aware that her conduct to forward the grievance to her supervisor posed a substantial risk of serious harm to Plaintiff. To the extent that Plaintiff complains that ARC Nurse Wilson Cruz failed in discharging her duties, the negligence of prison personnel does not constitute deliberate indifference. *Warwick v. Doe*, No. 3:20-CV-227 (JAM), 2020 WL 2768804, at *6 (D. Conn. May 27, 2020).

In any event, "inmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures do not give rise to a cognizable Section 1983 claim." *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (citations, alterations, and quotation marks omitted). "Inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, No. 3:19-CV-1444 (SRU), 2020 WL 127700, at *5 (D. Conn. Jan. 10, 2020) (claim relating to grievance procedures "confused a state-created procedural entitlement with a constitutional right"; "neither state policies nor 'state statutes ... create federally protected due process entitlements to specific state-mandated procedures'")). Thus, the Court must DISMISS Plaintiff's Eighth and Fourteenth Amendment claims against ARC Nurse Wilson Cruz as not plausible.

C.  **Requests   for   Declaratory   and   Injunctive   Relief**

Plaintiff requests both injunctive and declaratory relief. Compl. at ¶ 22.

As an initial matter, any claims for money damages against Defendants who are state employees, in their official capacities, are barred by the Eleventh Amendment. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

The U.S. Supreme Court recognizes a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit: when a plaintiff sues a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *See Ex parte Young*, 209 U.S. 123 155–56 (1908). A plaintiff may seek injunctive relief against a state official only to the extent that he

alleges an ongoing violation of the constitutional rights for which a federal court may enter an order of prospective relief against a state official in his official capacity. *See, e.g., Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). However, the exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Plaintiff is seeking a declaratory judgment stating that Defendants have violated his constitutional rights. To the extent he seeks a declaratory judgment based on past conduct, this request is barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief."). Moreover, if Plaintiff were to prevail on his Eighth Amendment claims, a judgment in his favor would serve the same purpose as a declaration that Defendants violated his constitutional rights. A "dismissal of a declaratory judgment action is warranted where the declaratory relief plaintiff seeks is duplicative of his other causes of action." *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 443 (S.D.N.Y. 2016). Thus, Plaintiff's request for declaratory relief is not distinct from the relief sought in his section 1983 claim and is dismissed. *See, e.g., United States v. $2,350,000.00 in Lieu of One Parcel of Property Located at 895 Lake Ave., Greenwich, Connecticut*, 718 F. Supp. 2d 215, 229 n.7 (D. Conn. 2010) (noting that if property is not forfeited, receiver-claimants would have been shown to be prevailing innocent owners and declaration to that effect would be redundant).

Plaintiff asks the Court to order DOC to provide him with medical care and to cease bringing him to UConn Health. Plaintiff has stated plausible Eighth Amendment claims for past deliberate indifference by Defendants Correctional Officers Lambo, Colon, Whittend, and Marquis, Lieutenants Castro and Washington, and Nurses Lenarz and Ventrella in connection with his failure to receive health care during his forty-day 2019 RHU confinement. He has not, however, alleged an ongoing violation of his constitutional rights by these Defendants in order to sustain his official capacity claims for injunctive relief. The official capacity claims for injunctive relief must be DISMISSED.

## ORDERS

For the foregoing reasons, Plaintiff may proceed on his Eighth Amendment individual capacity claims for damages against Correctional Officers Lambo, Colon, Whittend, and Marquis, Lieutenants Castro and Washington, and Nurses Lenarz and Nurse Ventrella for their deliberate indifference to his medical needs while he was in the RHU for forty days in 2019. All other claims and Defendants are DISMISSED from this action without prejudice.

(2) The clerk shall verify the current work address of Correctional Officers Lambo, Colon, Whittend, and Marquis, Lieutenants Castro and Washington, and Nurses Lenarz and Nurse Ventrella with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the amended complaint to them at their confirmed addresses within twenty-one (21) days of this Order, and report on the status of the waiver request on the thirty-fifth (35th) day after mailing. If a defendant fails to return the waiver request, the clerk shall make arrangements

for in-person individual capacity service by the U.S. Marshals Service on that Defendant, and Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(4) Defendants shall file a response to the amended complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If Defendants choose to file an answer, defendants shall admit or deny the allegations and respond to the cognizable claims recited above.  Defendants may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within six months (180 days) from the date of this Order. Discovery requests need not be filed with the Court.

 (6) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(7) All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

(8) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If

no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court.  Failure to do so can result in the dismissal of the case.  The plaintiff must give notice of a new address even if he is incarcerated.  He should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address.  He should also notify Defendants or defense counsel of his new address.

(10) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court.  Local court rules provide that discovery requests are not filed with the court.  D. Conn. L. Civ. R. 5(f).  Therefore, discovery requests must be served on defendants' counsel by regular mail.

---

**Vanessa L. Bryant**
**United States District Judge**


**SO ORDERED at Hartford, Connecticut this 15th day of February, 2022.**